# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN SIEFKEN, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>MORGAN STANLEY, MORGAN STANLEY & CO., INC., MORGAN STANLEY PLANS "INVESTMENT COMMITTEE," MORGAN STANLEY PLANS "ADMINISTRATIVE COMMITTEE," JOHN J. MACK, C. ROBERT KIDDER, ERSKINE B. BOWLES, DONALD T. NICOLAISEN and JOHN DOES 1-10, )<br><br>Defendants. ) | **CIVIL ACTION NO**.<br><br>CLASS ACTION COMPLAINT<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff John Siefken ("Plaintiff"), by his attorneys, on behalf of the Morgan Stanley 401(k) Plan (the "401(k) Plan")[1] and Morgan Stanley Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plan" or "Plans") and a class of similarly situated current and former participants ("Participants") in the Plans during the proposed Class Period (defined below), alleges as follows:

---

[1] Upon information and belief, prior to December 24, 2003, the 401(k) Plan was known as the Morgan Stanley DPSP/START Plan as a result of the merger between Morgan Stanley & Co. Incorporated Deferred Profit Sharing Plan with and into the Dean Witter START Plan (Saving Today Affords Retirement Tomorrow), effective October 1, 2002. *See* Securities and Exchange Commission Form 10-K for the fiscal year ended November 30, 2003 ("2003 10-K"), p. E-3 (describing exhibit No. 10.18).

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.      Plaintiff was employed with Morgan Stanley ("Morgan Stanley" or the "Company") and was a participant in the Plans during the Class Period, during which time the Plans held interests in the Company's common stock. Plaintiff's retirement investment portfolio in the Plans during the Class Period included Morgan Stanley stock.

3.      Plaintiff brings this action for Plan-wide relief on behalf of the Plans and on behalf of a class of all Participants in the Plans for whose individual accounts the Plans held shares of Morgan Stanley common Stock and/or a fund invested in Morgan Stanley common stock (collectively, "Morgan Stanley Stock," "Stock," or "Fund")

4.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common Stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Morgan Stanley Stock was one of the investment alternatives of the Plans throughout the Class Period.

5.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plans as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plans' heavy holdings of Morgan Stanley Stock.

6.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer Morgan Stanley Stock as a Plan investment option for participant contributions when it was imprudent to do so; and (2) maintaining the Plans' pre-existing heavy investment in Morgan Stanley equity when Company Stock was no longer a prudent investment for the Plans.   These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement.   *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

7.      Plaintiff's Count II alleges that certain Defendants failed to communicate to the Plans' participants complete and accurate information regarding the Plans' investment in Morgan Stanley securities sufficient enough to advise participants of the true risks of investing their retirement savings in Company Stock.

8.      Plaintiff's Count III alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

9.      Plaintiff's Count IV alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Morgan Stanley Stock as an investment option and investing Plan assets in Morgan Stanley Stock when it was no longer prudent to do so.

10.    Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plans' assets in Morgan Stanley equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below, among other things, (a) the Company's failure to disclose material adverse facts about its financial well-being, business relationships and prospects; (b) the foreseeable deleterious consequences to the Company resulting from its substantial entrenchment in the subprime mortgage market; (c) the fact that, as a consequence of the above, the Company's Stock price was artificially inflated; and (d) the fact that heavy investment of retirement savings in Company Stock would inevitably result in significant losses to the Plans, and consequently, to its participants.

11.    This action is brought on behalf of the Plans and seeks recovery of losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plans, inclusive of all participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

14.    More specifically, this district is an appropriate venue for this action because, on a recent Form 5500 annual filing with the Internal Revenue Service and Department of Labor, the address listed for the sponsor of each of the Plans is in this district. *See* IRS and DOL Form 5500 for the Plan, filed 2006 ("2006 Form 5500"). Accordingly, it is likely that many of the parties and potential witnesses, including corporate executives and many of the Plans' participants, are located in or within close proximity to this district.

**PARTIES**

**Plaintiff**

15.    Plaintiff John Siefken is a "participant," within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), in the Plans and held Morgan Stanley shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Morgan Stanley**

16.    Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York 10036. Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services – namely, financial advisory services, investment advisory services covering various investment alternatives, global asset management products and services in equity, fixed income, alternative investments and private equity – to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals. *See* Securities and Exchange Commission Form 10-K for the fiscal year ended November 30, 2006

field on February 13, 2007 ("2006 10-K").  As of November 30, 2006, Morgan Stanley had 55,310 employees worldwide.  *Id.*

17.    Morgan Stanley is the Plan Sponsor for the ESOP.[2]  *See* 2006 Form 5500. Further, the Company exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and was therefore a fiduciary of the Plans in its own right.  Morgan Stanley acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

18.    Morgan Stanley & Co. Inc. is the Plan Sponsor for the 401(k) Plan.  *See* 2006 Form 5500 at schedule D, Part II (a)-(b).  Morgan Stanley & Co. Inc. is a wholly owned subsidiary of Morgan Stanley.  2006 11-K at p. 3.[3]

19.    Morgan Stanley had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plans-related activities.  Through its Board of Directors or otherwise, Morgan Stanley had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with

---

[2] As explained further below, the assets of the Plans are combined and commingled in the Morgan Stanley Defined Contribution Master Trust ("Master Trust") (*see* Securities and Exchange Commission Form 11-K for the fiscal year ended  December 31, 2006 ("2006 11-K") at p. 3).

[3] References to Morgan Stanley include reference to Morgan Stanley & Co., Inc., unless otherwise noted.

respect to the Plans. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plans, its participants and their beneficiaries. Accordingly, the actions of the Board of Directors, the Plans' administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

20.     The Company and its Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets. Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plans, appointing, monitoring and removing members of committees charged with the operation of the Plans, and for determining the amount, if any, of any additional discretionary contributions by the Company to the Plans. Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plans, including, without limitation, members of the Plans' Investment Committee and Administrative Committee, if necessary in order to best serve the interests of the Plans' participants.

**Investment Committee Defendants**

21.     Upon information and belief, the Investment Committee consists of no fewer than three persons, each of whom is an employee and/or an advisory director of the Company. Management of the investment options of the Plans is placed in the hands of the Investment Committee who are appointed from time to time by, and serve at the pleasure of the Board. *See* Morgan Stanley DPSP/START Plan, effective October 1, 2002 ("2002 Plan").

22.    More specifically, the Investment Committee is delegated responsibility for the selection of investment options for the Plans and monitoring the performance of the Investment Funds and is a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA. *See* 2002 Plan at 48.

23.    The Investment Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Administrative Committee Defendants**

24.    Upon information and belief, the general administration of the Plans is placed in the hands of the Administrative Committee. The members of the Committee are appointed from time to time by, and serve at the pleasure of, the Board.[4] *See* 2002 Plan at p. 74. The Committee consists of no fewer than three persons, each of whom is either an employee and/or an advisory director of the Company. *Id.*

25.    Upon information and belief, the Administrative Committee is a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA. *Id.*

26.    The Administrative Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

---

[4] The ESOP was amended, effective November 27, 2006, to place direct administration of the ESOP within the purview of the Board: "The Plan shall be administered by the Board of Directors, which may . . . but need not, delegate some or all of its authority under the Plan to and Administrator." *See* Ex. 10.16 to 2006 10-K at p.8.

**Director Defendants**

**Chairman/CEO**

27.    Defendant John J. Mack ("Mack") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board during the Class Period.  Defendant Mack was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Compensation, Management Development and Succession Committee**

28.    The Compensation, Management, Development and Succession Committee ("Compensation Committee") is a committee of the Board of Directors.  The Compensation Committee's charter provides, in relevant part, that:

> The Committee shall: . . . . Administer and amend, as it determines appropriate, any present or future incentive compensation plan, equity-based plan or employee benefit plan providing that is shall be administered or amended by the Board or the Committee.  The Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such plan provides shall be exercised or performed by the Board or the Committee, including without limitation to (i) issue or grant equity-based awards pursuant to such plan, (ii) authorize or reserve shares of common stock for issuance thereunder and (iii) make any such equitable anti-dilution adjustments required in the event of an equity restructuring or similar event.

29.    Defendant C. Robert Kidder ("Kidder") served as a member and the Chairman of the Compensation Committee during the Class Period.  Defendant Kidder was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

30.    Defendant Erskine B. Bowles ("Bowles") served as a member of the Compensation Committee during the Class Period. Defendant Bowles was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

31.    Defendant Donald T. Nicolaisen ("Nicolaisen") served as a member and the Chairman of the Compensation Committee during the Class Period. Defendant Nicolaisen was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

32.    Defendants Mack, Kidder, Bowles and Nicolaisen are referred to collectively as the "Director Defendants."

**Additional "John Doe" Defendants**

33.    Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Administrative and/or Investment Committees, as well as Company officers, directors and employees who are or were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLANS

34.    Each of the Plans is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such

as this, the Plans are neither defendants nor plaintiffs. Rather, pursuant to ERISA § 409, 29

U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of

the Plans and their participants and beneficiaries.

**401(k) Plan**

35. The 401(k) Plan is a "defined contribution plan" within the meaning of ERISA §

3(34), 29 U.S.C. § 1002(34). It is described as a profit-sharing plan that includes a "qualified

cash or deferred arrangement." 2006 Form 11-K at p. 3.

36. All of the 401(k) Plan's investments are held in a trust account at Mellon Bank,

N.A. (the "Trustee"). *Id.* Further, the Master Trust (defined above) "includes commingled

assets of the Plan and the ESOP." *Id.*

37. Full-time, Flex Part-time, and Regular Part-time employees are eligible to

participate in the 401(k) Plan at commencement of employment.[5]

38. Individual accounts are maintained for each 401(k) participant. Each participant's

account is credited with employee contributions, Company matching contributions and profit

share contributions, the 401(k) Plan's earnings, and charged with the allocation of investment

losses and administrative expenses not otherwise paid by the Company. 2006 Form 11-K at p. 4.

39. All contributions to the 401(k) Plan may be allocated among any of the available

investments selected by the participant from among the investments designated by the

Investment Committee.

40. As of December 31, 2006, there were 25 investment vehicles within the Master

---

[5] Part-time employees regularly scheduled to work less than 20 hours per week and
Discover employees classified as Part-Time, Prime-time, Hourly or Temporary are only eligible
to participate after completing one year of service and attaining age 21. 2006 Form 11-K at 3.
Further, employees hourly employees hired after July 1, 2004 are not eligible to participate in the
401(k) Plan.

Trust, including a Company Stock Fund, which were available for selection in the 401(k) Plan, including Company stock.

Participant Contributions

41.    Each participant may elect to make contributions to the 401(k) on a pre-tax basis through payroll deductions from 1% through 20% of such participant's eligible annual compensation up to an annual maximum of $15,000 for 2006. 2006 Form 11-K at p. 3.

42.    In addition, participants who are age 50 or older may make a pre-tax catch-up contribution to the 401(k) Plan through payroll deductions from 1% to 20% of eligible compensation to an annual maximum of $5,000 in 2006.[6] A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

43.    Employees -- other than those considered to be non-highly compensated employees -- may also elect to contribute up to 10% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.

44.    Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in the earnings thereon. 2006 401(k) Plan at p. 5.

Company Contributions

45.    To be eligible for a company match for a year, an employee must participate in the 401(k) Plan by making pretax contributions in the year the match is received and must be employed by the Company on December 31 of that year. 2006 Form 11-K at 4.

46.    In 2006 all Company contributions were to the ESOP. These contributions include profit sharing contributions and Company matching contributions on a pre-tax basis. *Id.* These contributions are allocated in the Morgan Stanley Stock under the ESOP.

_____

[6] Effective May 16, 2006, Puerto Rico residents age 50 or over will be limited to maximum catch-up contributions of $500.

47.     Participants in the 401(k) Plan hired on or after January 1, 2004 become vested in Company contributions and earnings thereon upon the earlier of the following: (1) completion of three years of service; or (2) if a participant terminates employment due to death, total and permanent disability, retirement or release as defined by the 401(k) Plan document.[7]  2006 Form 11-K.

48.     Prior to January 1, 2007, Participants of the 401(k) Plan age 55 and older or no longer with the Company could diversify a portion of their accounts in the ESOP by transferring them to the 401(k) Plan.  However, effective January 1, 2007, these participants have the option to diversify all of their Company Contributions.  Participants under age 55 "may diversify when they have at least three years of service" for any contributions made in or after January, 2007.  2006 11-K at p. 15.  For contributions made prior to January 2007, participants under the age of 55 may diversify their pre-2006 contributions as follows: up to 25% on or after January 31, up to 50% on or after May 1, up to 75% on or after August 1, and 100% on or after October 31.

49.     As of December 31, 2006, the 401(k) Plan held Morgan Stanley Common Stock, valued at $12,464,606.  In order to provide participants the "opportunity to elect to receive cash payment of the dividends paid on the [Morgan Stanley Common Stock Fund] the . . . shares are transferred quarterly to the ESOP wherein dividends are earned."  2006 Form 11-K at p. 12.

50.     As a result of the 401(k) Plan's holdings of Morgan Stanley Stock, the Plan and its participants have suffered significant losses due to the breaches described herein.

---

[7] Different vesting rules apply to employees of the Company's subsidiaries hired before January 1, 2004.  For instance, an employee of Global Wealth Management, Individual Asset Management, Discover or Infrastructure and Company, hired prior to January 1, 2004, who is a participant of the 401(k) Plan is 100% vested in Company contributions under the ESOP upon the earliest of (i) attaining age 65 in-service, (ii) termination of employment due to death, total and permanent disability, retirement or release, or (iii) completing three years of credited service for contributions attributable to 401(k) Plan Years beginning before January 1, 2002.  2006 Form 11-K at p. 5.

**ESOP**

51.    Morgan Stanley sponsors the Morgan Stanley ESOP. *See* 2006 Form 5500 at Schedule D, Part II. The assets of the ESOP, which consist purely of Morgan Stanley Stock are held in the Mater Trust along with assets from the 401(k) Plan. *See* 2006 11-K at 3.

52.    Employees are eligible to participate in the ESOP beginning on the later of (i) the employee's date of hire by the Company or any subsidiary and (ii) the date such employee becomes an eligible employee.[8] *See* Ex. 10.16 to 2006 Form 10-K, at p. 8.

53.    The ESOP is administered by the Board of Directors which has "full power and authority to construe and interpret the [ESOP], to prescribe, amend and rescind rules and regulations relating to it, and to make all other determinations necessary or advisable in administering the [ESOP]. *Id.*

54.    Upon information and belief, participants make contributions to the ESOP through their contributions to the 401(k) Plan which then transfers all investments in the Morgan Stanley Common Stock to the ESOP. "Quarterly transfers are made from the Morgan Stanley Stock Fund under the [401(k)] Plan to the ESOP throughout the [401(k)] Plan year and all forfeitures are transferred to the ESOP." 2006 Form 11-K at 4.

55.    Further, all Company contributions, including profit sharing contributions and Company matching contributions, are made to ESOP. 2006 Form 11-K at 4.

56.    As noted above, vesting in Company contributions occurs when participants hired on or after January 1, 2004 achieve the earlier of the following: (1) completion of three years of

---

[8] Each Eligible Employee who is first hired by the Company or a subsidiary on or after April 1, 2002 shall be eligible to participate in the ESOP beginning on the later of (i) the first day of the month following the date the employee has completed one year of service for the Company and its subsidiaries, provided that he is employed on such date and (ii) the date such employee becomes an Eligible Employee. *See* Ex. 10.16 to 2006 Form 10-K, at p. 8.

service; or (2) if a participant terminates employment due to death, total and permanent disability, retirement or release as defined by the 401(k) Plan document. 2006 Form 11-K.

57.    As further noted above, prior to January 1, 2007, Participants of the 401(k) Plan age 55 and older or no longer with the Company could diversify a portion of their accounts in the ESOP by transferring them to the Plan. However, effective January 1, 2007, these participants have the option to diversify all of their Company Contributions. Participants under age 55 "may diversify when they have at least three years of service." 2006 11-K at p. 15.

58.    At year end 2006, the Master Trust held $2,985,709,923 of commingled 401(k) Plan and ESOP Company securities, out of total assets of $5,817,564,015. 2006 Form 5500, Schedule H, Part 1.

59.    Each and every participant of the ESOP had Company Stock in their ESOP account during the Class Period. As a result, a substantial portion of the ESOP's assets are invested in Company Stock.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Morgan Stanley 401(k) Plan (the "401(k) Plan") and the Morgan Stanley Employee Stock Purchase Plan (the "ESOP") (collectively, "Plan" or "Plans") at any time between August 9, 2006 and the present (the "Class Period") and whose Plan accounts included investments in Morgan Stanley Stock. Excluded from the Class are the defendants, any entity in which the defendants have a controlling interest, or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants.

61.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plans accounts included investment in Morgan Stanley Stock.

62.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and Beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plans and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

65.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

66.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

67.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

68.    During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

69.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, the Company, the Board and the Plans Committees were named fiduciaries of the Plans.

70.    Instead of delegating fiduciary responsibility for the Plans to external service providers, Morgan Stanley chose to internalize at least certain aspects of this fiduciary function.

71.    Upon information and belief, the Company administered the Plans and the Plans'

assets through the Board, Investment Committee and the Administrative Committee, which had discretionary authority to manage and control the operation and administration of the Plans and investment of their assets, as noted and described above. The Company, through the Board, was, upon information and belief, responsible for appointing, evaluating and monitoring the Plans' committees, including, without limitation, the Investment Committee and Administrative Committee, including their members and delegees.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

72.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

73.    Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001)

18

("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Jones v. Am. Gen. Life & Accident Ins. Co.,* 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3rd Cir. 1993).

74.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company Stock.   These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plans/participant holdings of Company Stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Morgan Stanley's SEC filings were incorporated into and part of the SPDs, the Prospectus and/or the Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

75.     Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[9] concerning investment in company Stock, including that:

---

[9] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior,* 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company Stock in 401(k) plans - the importance of plan design,* Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(a)     Employees tend to interpret a match in company Stock as an endorsement of the company and its Stock;

(b)     Out of loyalty, employees tend to invest in company Stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company Stock, and many retirement professionals would advise employees to avoid investment in company Stock entirely;

(f)     Lower income employees tend to invest more heavily in company Stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company Stock are not commensurate with it rewards.

76.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company Stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## DEFENDANTS' CONDUCT

77.     Morgan Stanley is one of the world's largest wealth management, capital market and advisory companies, and one of the top investment banks in the United States. As such, the

Company is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide. *See* 2006 10-K.

78.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants.  Although they knew or should have known that the Company's Stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Morgan Stanley Stock.

**A.    The Subprime Mortgage Industry**

79.    Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

80.    Typically, subprime borrowers have relatively low credit scores along with little or no money to apply to a down-payment on a home.  These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

81.    According to an article in *USA Today* from December 7, 2004, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or "80-20" loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan." *USA Today*, "Subprime Loan Market Grows Despite Troubles," December 7, 2004.

82.    Subprime mortgage loans represent a greater risk to lenders than prime mortgage

loans. For example, one product marketed by some subprime lenders is a Pay Option ARM, which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually. The borrower can choose from a variety of payment options, including one that is below what would be paid in an interest-only mortgage. Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period. Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made. In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage. The reversion to full amortization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment. If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

83.    An additional product marketed by many subprime lenders is the 2/28 ARM, which is an adjustable rate mortgage that fixes rates for two years, and then resets to an ARM rate index value (*e.g.* the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) after the two-year mark. For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan. As with the Pay Option ARM discussed above, if borrowers are unable to refinance the loan and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

84.    Rather than hold mortgage loans, generally, lenders sell subprime mortgages

bundled into bonds and offered to individual and institutional investors. Morgan Stanley publicly expressed interest in subprime mortgage lenders two years ago when Defendant Mack "spoke publicly of adopting a higher risk profile and pushed [Morgan Stanley] into in-vogue investment areas like subprime mortgages." *See* "Morgan Stanley Executive Ousted After Trading Loss," *The New York Times*, November 30, 2007.

85.     As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with borrowers' ability to repay over the long term and more concerned with their mere volume of loans over the short term. This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

86.     Thus, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:



**Bad Omen?**

Loans to people with weak credit are showing signs of distress earlier than in recent years.

Early defaults in subprime

*Share of subprime loans that were in foreclosure or where the home had been repossessed within six months after the loans were securitized.*

Source: Moody's Investors Service

The New York Times

Source:  *The New York Times*, "Tremors at the Door," January 26, 2007.

87.     The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market.  During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

**B.     Morgan Stanley Gambled on the Subprime Market**

88.     Generally speaking, a collateralized debt obligation ("CDO") is a security backed by a pool of bonds, loans and other assets.  Morgan Stanley was/is deeply entrenched in investments in the subprime mortgage market, including CDOs and other mortgage-backed securities, having "recently [become] a lead player in underwriting subprime-mortgage securities."  *See The Wall Street Journal*, "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," November 8, 2007.

89.     Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Morgan Stanley inexplicably chose to charge forward and

*increase* its entrenchment in the subprime mortgage market. In fact, "[a]fter acquiring subprime mortgage originator Saxon Capital Inc. for $706 million, Morgan Stanley ranked No. 1 in underwriting securities backed by subprime mortgages." *See* "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," *The Wall Street Journal*, November 8, 2007.

90.     This is particularly alarming as it has been noted that investing in subprime mortgages was "outside the traditional expertise of Morgan Stanley." *See* "Morgan Stanley Executive Ousted After Trading Loss," *The New York Times*, November 30, 2007.

91.     Morgan Stanley's involvement in the subprime mortgage is immense. It recently indicated that it had "subprime net exposures of $10.4 billion at the end of its third quarter on [August 31, 2007] which had declined to $6 billion as of [October 31, 2007] – [only] a month before the end of the firm's fourth quarter." *See* "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," *The Wall Street Journal*, November 8, 2007.

92.     Thus, despite the fact that they knew or should have known that Morgan Stanley's heavy involvement in the CDO and subprime loan origination markets could lead to a substantial devaluation of the Company's Stock once the underlying financial realities and true risks became known, certain of Defendants had a very strong financial incentive to conceal the truth and keep the Company's Stock price artificially high and write-downs for subprime losses artificially low.

**C.    During the Class Period, Morgan Stanley Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan participants**

93.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants, including statements that concealed that: (1) the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry inevitably deteriorated; (2) the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) the

Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; and (4) the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

94.    Morgan Stanley's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing Morgan Stanley and its financial well-being, thus resulting in the overvaluation and artificial inflation of its Stock. Defendants further knew or should have known that the Company's Stock price would plummet—and that the Plans' participants would suffer tremendously and unnecessarily—once the foreboding truth became known.

95.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and the Plans' participants that Morgan Stanley would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

96.    For example, on August 9, 2006, the first day of the Class Period, Morgan Stanley issued a press release announcing that it had reached an agreement to acquire Saxon Capital, Inc., a premier servicer and originator of residential mortgages, for $706 million, or $14.10 per share in cash for Saxon Stock.[10]

97.    In touting Morgan Stanley's latest acquisition, Anthony Tufriello, Global Head of the Securitized Products Group proudly stated:

> The acquisition of Saxon is another important step in our long-term strategy of broadening the Firm's global franchise in the critical residential mortgage business, which represents the single largest segment of the global debt market. Saxon builds on our existing origination and securitization capabilities by providing us with an extremely strong servicing platform. This is an important part of the residential mortgage business, and the addition of Saxon will

---

[10] The actual acquisition of Saxon Capital, Inc., occurred on December 4, 2006. *See* 2006 Form 10-K.

further enhance our risk management of mortgage portfolios. This deal also provides Morgan Stanley with new origination capabilities in the non-prime market, which we can build upon to provide access to high-quality product flow across all market cycles.

August 9, 2006, Morgan Stanley Press Release.

98.    On March 1, 2007, Morgan Stanley reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in the first quarter of 2006. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Defendant Mack was ecstatic. He stated:

> Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses. Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders.

March 21, 2007 Morgan Stanley Press Release.

99.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.95.

100.    On June 20, 2007, Morgan Stanley announced continued record breaking results. It had record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net revenues were a record $11.5 billion, 32 percent above last year's second quarter. *See* June 20, 2007 Morgan Stanley Press Release.

101.    Defendant Mack again was effusive in his praise for the Company's outlook:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

102.    Amidst a cacophony of concerns regarding the collapse of the subprime mortgage market, the Company continued to conceal the truth regarding its true financial condition and uttered nothing regarding its potential liability.

103.    Throughout autumn 2007, the stock prices of many large lenders dropped significantly. This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges. Nevertheless—and despite the Plans' heavy investment in Company Stock—Morgan Stanley stubbornly stood its ground and continued to hide the truth about its financial condition.

**The Truth Finally Begins to Emerge**

104.    Morgan Stanley's third quarter 2007 results were disappointing. Compared to the first half of 2007 where it had experienced record results, Morgan Stanley reported on September 19, 2007 that income from continuing operations ended August 31, 2007 had decreased 7 percent from the third quarter in 2006.

105.    Finally, on November 7, 2007, Morgan Stanley issued a press release "announcing significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures as  result of the continued deterioration in the market . . . ." *See* Securities and Exchange Commission Form 8-K filed on November 8, 2007 ("Nov. 2007 8-K"). As a result,

28

Morgan Stanley recorded a $3.7 billion write-down. Morgan Stanley's Stock slid 6.1% after the announcement to $51.19.

106. Morgan Stanley stock hit a new 52-week low on November 21, 2007 closing at $47.56 per share.

107. Further fall-out was to follow. On November 30, 2007, Morgan Stanley co-president Zoe Cruz was terminated. *See* "Ahead of the Bell: Morgan Stanley," *Bloomberg.com*, November 30, 2007. This helped fuel speculation that further losses were in store for Morgan Stanley. Wachovia Capital Markets LLC analyst Douglas Sipkin wrote in a client note that Morgan Stanley will likely take a write-down larger than the $3.7 billion it announced on October 31, 2007. *See Chron.com*, November 30, 2007. "Sipkin now expects Morgan Stanley to lose 36 cents per share." *Id.*

108. As the truth began to emerge, Plan participants suffered drastically as Morgan Stanley's Stock price plunged to a low of $47.56 on November 21, 2007 from a 52-week high of $90.95 on June 15, 2007.

109. Morgan Stanley's misfortunes continued into December 2007. On December 19, 2007, Morgan Stanley announced that it would have to take a ***$9.4 billion*** write-down related to mortgages, more than double its prior prediction. Standard and Poor's called the write-down unexpected and "massive." See "Morgan Gets Infusion from China After Swinging to a Quarterly Loss," *Wall Street Journal*, December 19, 2007.

110. In addition, the Fourth Quarter results were disappointing; Morgan Stanley lost $3.6 billion ($3.61 per share) versus a profit of $2.0 billion ($1.87 per share) from the prior year. *See* "Morgan Stanley's Subprime Submergence," *Forbes. Com*, December 19, 2007.

111. As a result of the dismal Fourth Quarter announcement, Fitch Ratings maintained

its Negative outlook, stating that the loss "is consistent with the extreme stress scenario that prevails upon mortgages and structured credit products." *See* "Fitch Affirms Morgan Stanley Ratings," *The Motley Fool (fool.com)*, December 19, 2007.

112.   The Company was forced to look for outside sources of capital and agreed to sell a 9.9% stake in the Company to China Investment Corp. in exchange for a $5 billion stake.

**D.    Defendants Knew or Should Have Known That Morgan Stanley Stock Was An Imprudent Investment For The Plans, Yet Mislead Plan Participants.**

113.   During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company Stock.

114.   As a result of the enormous erosion of the value of Company Stock, the Plans' participants, the retirement savings of whom was heavily invested in Morgan Stanley Stock, suffered unnecessary and unacceptable losses.

115.   At all relevant times, Defendants knew or should have known that Morgan Stanley Stock was an imprudent investment for the Plans as a result of the risks to the Company's financial well-being and prospects due to the inherent risks associated with Morgan Stanley for among other things: (a) placing such a heavy "bet" in the subprime lending market, through CDOs, corporate acquisition, and otherwise; and (b) failing to properly report estimated losses.

116.   Through their high ranking positions within the Company – especially the Director Defendants – Defendants knew or should have known of the existence of the above-mentioned problems.

117.   As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any

generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Morgan Stanley Stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company Stock.

118.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA. Defendants also failed to conduct an appropriate investigation into whether Morgan Stanley Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Morgan Stanley's deep-rooted problems so that participants could make informed decisions regarding whether to include Morgan Stanley Stock in the Plans.

119.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Morgan Stanley Stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

120.    Because Defendants knew or should have known that Morgan Stanley was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Morgan Stanley Stock.

121.    Defendants had available to them several different options for satisfying this duty, including, but not limited to: making appropriate public disclosures as necessary; divesting the Plans of Morgan Stanley Stock; discontinuing further contributions to and/or investment in Morgan Stanley Stock under the Plans; consulting independent fiduciaries regarding appropriate

31

measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Morgan Stanley they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Morgan Stanley Stock.

122.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in Morgan Stanley Stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even as Morgan Stanley's problems came to light.

E.    **Defendants Regularly Communicated with the Plans' Participants Regarding Investments in Morgan Stanley Stock Yet Failed to Disclose the Imprudence of Plan Investment in Morgan Stanley Stock**

123.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company whose common Stock was, one of, if not the, largest assets of each of the Plans. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's Stock, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's Stock. As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's Stock and therefore could not make informed decisions regarding their investments in the Plans.

124.    The SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plans' participants of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand. These statements were made with the implicit knowledge that the Plans' participants would rely upon

such information in determining whether to maintain investment in Morgan Stanley Stock.

F.     **Defendants Suffered From Conflicts of Interest**

125.    Morgan Stanley's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of Stock option awards.

126.    Because the compensation of at least several of the Defendants was significantly tied to the price of Morgan Stanley Stock, Defendants had incentive to keep the Plans' assets heavily invested in Morgan Stanley Stock on a regular, ongoing basis. Elimination of Company Stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Morgan Stanley Stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Morgan Stanley Stock, resulting in reduced compensation for the Defendants.

127.    For instance, Defendant Mack was awarded $40 million in Stock and options for 2006 – at the time, the highest amount ever awarded to a Wall Street CEO. *See CNNMoney.Com.*, "Is John Mack Worth $40 Million?" December 15, 2006.

128.    Some Defendants may have had no choice in tying their compensation to Morgan Stanley Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Morgan Stanley Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

129.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and Stockholders, and the interests of the Plan participants and Beneficiaries, whose interests the Defendants were obligated to loyally serve

with an "eye single" to the Plan. *See generally Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

130.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

131.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

132.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

133.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

134.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They

entail, among other things:

    a.      The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

    b.      A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

    c.      A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

135.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

136.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and

ERISA § 405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

139.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company Stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans.  Defendants are liable for losses incurred as a result of such investments being imprudent.

140.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

141.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that the Company Stock was not a suitable and appropriate investment for the Plans as described herein. Investment in the Company Stock during the Class Period clearly did not serve the Plans' purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

142.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company Stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and Beneficiaries, lost a significant portion of their retirement investment.

144.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA by all Defendants)

145.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

146.    At all relevant times, as alleged above, the above-listed Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

147.    At all relevant times, the scope of the fiduciary responsibility of the above-listed Defendants included Plans-related communications and material disclosures.

148.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans' investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans. This duty applies to all of the Plans' investment options, including investment in Company Stock.

149.    These Defendants knew that investment in Company Stock carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

150.  These Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company Stock and, generally, by conveying inaccurate information regarding the Company's future outlook.  These failures were particularly devastating to the Plans and their participants—losses in this investment had an enormous impact on the value of participants' retirement assets.

151.  These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company Stock in the Plans at a time when these Defendants knew or should have known that the Plans' participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company Stock.

152.  Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

153.  Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such

misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested assets of the Plans in the Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

154.    As a consequence of these Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

155.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

156.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

158.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

159.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

160.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

161.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count

## COUNT IV

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Morgan Stanley & Director Defendants)**

162.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

163.    At all relevant times, as alleged above, Morgan Stanley and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

164.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Morgan Stanley and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Investment Committee, the Administrative Committee and any other Plan committees.

165.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Morgan Stanley and the Director Defendants, had the duty to:

(1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

42

(4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

166.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

167.    Morgan Stanley and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Morgan Stanley and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i)

imprudently allowing the Plans to continue offering the Morgan Stanley Stock fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plan in Morgan Stanley Stock when it no longer was prudent to do so.  Despite this knowledge, Morgan Stanley and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

168.    In addition, Morgan Stanley and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Morgan Stanley that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

169.    Morgan Stanley and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

170.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

171.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

172.   The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plans' participants.

173.   Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. By failing to apprise participants of the problems within the Company and of the fact that the Company Stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company Stock as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company Stock, and Defendants remain liable under ERISA for losses caused by such investment.

174.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company Stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

175.   As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

176.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any

person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

177.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

178.    Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

179.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## SECTION 404(c) DEFENSE INAPPLICABLE

180.    The Plans suffered losses, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plans were invested in Morgan Stanley Stock during the Class Period in violation of the Defendants' fiduciary duties.

181.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

182.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plans.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

183.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Morgan Stanley Stock in the Plans.   Accordingly, participants failed to exercise the requisite independent control over their investment in Morgan Stanley Stock in the Plans.

184.    In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in

that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

185.    The Defendants' liability to the Plans, Plaintiff and the Class for relief stemming from the Plans' imprudent investments in Morgan Stanley Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common Stock of Morgan Stanley maintained by the Plans in proportion to the accounts' losses attributable to the decline in the Stock price of Morgan Stanley;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: December 20, 2007                    Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**
Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile:  (212) 385-2117

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Katherine B. Bornstein
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056

*Attorneys for Plaintiff*

49